Good morning, Your Honor. May it please the Court. David Lieberman, together with Robert Most, here on behalf of Plano's Petitioners' Christian Lunch. I would like to reserve three minutes for revoting. There's a lot of issues in this case. There's no question about it. And I would like to focus today on the preliminary injunction standard, because I believe, having reviewed this material again, that whatever the standard is that the Court adopts, that almost virtually will determine the outcome of the case. The four-part test, the preliminary injunction under Winter and under Alliance for Rockies and a plethora of Ninth Circuit decisions, the third and fourth, irreparable harm, I'd like to start there, in balance of equities. This Court and the Supreme Court have universally or unanimously said that the loss of First Amendment rights is irreparable harm in and of itself, without more. Can I ask you, you still need to show, even under the most generous reading of our cases, at least substantial questions going to the merits, right? Yes, the first two. Right, so maybe, I think, at least for me, I think that's where the probability of success on the merits is the more difficult question. Yes, and that's just a throw. That's just to say, we don't have to worry about that, because that's almost, as a matter of law, they exist. And to focus that more specifically, so the District Court said you hadn't shown that there was a traditional or designated public forum, but it also said that you hadn't shown that you were engaging in expressive activity or activity that anyone would understand to be communicating a message. And that, you know, maybe there are some reasons to think that that was wrong, but you did not present any argument against that finding. Against what specifically? The conclusion that you haven't engaged in expressive, that your conduct is not expressive. That's debatable. That's false. Well, it's debatable, but I don't see that you debated it. It's false. Right, but you didn't say so in your opening brief, did you? Yes, we did. Where is that? In the first section. This is the problem with this case. We had a previous case. Yeah. And the court said certain things are protected by the First Amendment, including the distribution of vegan and sanctified, sanctified vegan and vegetarian food. The worst controversy, or we had a four-month period out there when UCLA, after COVID, gave a permit for the spring and quarter summers. There were no problem. Sorry, I get a little carried away. There were no problems in that four months, not one complaint. Krishna Lunch provided everything, equipment, food, safety, fire, insurance, water. We were not told by Chanthop Hill, the events administrator, that we had done anything wrong, that there was one problem at all. And the thing they focused on is that previously this court said all these activities, kind of like on the Food Not Bombs case out of Fort Lauderdale, the 11th Circuit case, where they had, interestingly, another vegan group, not us, but they were distributing vegan food in the parks to homeless people. And the 11th Circuit went through a certain number of factors. If they're there, it's protected speech. Right. But our prior appeal, or the panel decision in the prior appeal, was at the motion to dismiss stage. And so we said, there's enough of a showing that it's expressive to survive a motion to dismiss. That doesn't dictate whether there's enough to get you a PI. The district court thought there wasn't. And that's the conclusion that I don't see you appealed. Okay. Let me preface that with this preliminary injunction, mostly the Alliance for Colorado or Rockies. The court said, and even Judd Mossberg, in his concurring opinion, said, there has to be some flexibility at the preliminary injunction stage. We don't know the whole record. We don't know what their complaints- I think the problem is, where in your opening brief did you make that argument? So the problem is, we might agree with you today, but we also have a rule that, for fairness to the other side, you have to make all your arguments in the opening brief. And I did not see either an argument in your opening brief that, when the district court said you hadn't shown enough of a success on the merits on whether it's expressive conduct to get a PI, I don't see anything in your opening brief that said the district court misunderstood the PI standard, the district court misunderstood our expressive content. Nothing. Instead, you go straight to the forum. So where, how do we, how do we say that you preserved the argument that this is expressive? Well, here's, here's, there's certain things, activities are not in dispute. There was signage. There was distribution of sanctified food. There was discussions with interests- But so why didn't you say in your opening brief, we had all these things, so we were expressive. So the court was wrong. We did say that. Where? Just in the, in the statement of facts, and the allegations of the complaint, we said, this is what we want to do. We, we, we cite the four months to show that this program can be done with no problems. There's no governmental interests that are raised by this program. There's no, what did they do with the $500? The problem with that is, though, after COVID, they said there are more people, so you had to, couldn't be on the walk anymore. You had to be in the plaza. And so then the rules are different. So, but that doesn't really go to whether it's expressive. I mean, that might go to whether they should have allowed you, but it's still, we still have this problem that you didn't talk about whether it's expressive. First of all, we have launched a facial attack on two aspects of the regulation, the $500 fee. They, nobody even talked about Murdoch. In 1943, Murdoch said a $50 permit fee was unconstitutional. It's too much. If they're impose a fee, and I'm saying independent of everything else, on a facial attack, the facts are irrelevant. You just look, what is the $500? Is it, is it exorbitant? Is it waivable? Is it nominal? In the Long Beach case, which had a big demonstration and the fee was a big issue in there, it said, it still said under Murdoch, it must be nominal or waivable. So I say- But that, that assumes it's a public forum, right? No. Well, if it's a public forum, but we say even a non-public forum, that is so egregious. We don't have $500, period. End of story. That's still, and it also assumes that it's expressive, right? Yes. Okay. So there were signs speaking to people. We submitted 10 declarations in rebuttal to show this is how I was treated. You can't do each and every, what I'm saying is my response to that is, give us the relief we want and put all of those things in the order. And that's what I asked the judge to do when UCLA changed its regulations again, we were back out there, I said, just put it in the injunction. You have to do this, you have to do that. Because I never saw this court's previous decision or the 11th Circuit decision say you have to do each and every one of these. We talked to people, we gave out food, that engendered questions from students. What is this? How do you make it? What good does it do? What's the meaning? There were books, literature was given, and there was signage. The only thing that I can think of that wasn't there was chanting, singing. And we were in a location at Kirchhoff Hall, where that is not conducive. And we've dealt with that with UCLA, you can't use the, you know, and singing, there's drums and cymbals and organs, and that can disturb the surrounding buildings and activities. And we didn't have a big enough area to really do that. But we did do all these other things. And I say, even if it's food and literature and speaking to people, those are all independently protected by the First Amendment. Maybe the food in conjunction with that, but certainly speaking and books, quintessential First Amendment activities. And I can't believe I'm going to say this, but in the GBS case, the Gaudi-Vaishnav t-shirt case out of San Francisco, this court said something about, if you have a commercial element, but you also have these expressive elements, then the whole thing has to be considered to be protected. So on that alleged gap in the record, and I'll admit, we were relying on the previous decision of the court, that that was no longer an issue. That had been decided, that those activities are definitely First Amendment. So if we weren't chanting, but we were doing all these other things, certainly people talking to people is First Amendment, certainly giving out literature, certainly putting up signs advertising your event and your police, and certainly the food, which is the whole point of what is this food? How will it help you? Why do we have to do this for climate change and global warming and shut down these factory farms? I can tell you this, I was just at a slaughterhouse hearing recently, where they wanted to build a slaughterhouse in a farm. So say you can get past this. Can I interrupt you? Because you're going to run out of time. If we get to the forum issue and we get past this expressive conduct issue, then what is your evidence? Do you have any evidence that the restrictions that UCLA put on you, the $500 fee and the four-day limit, were not evenly applied to other outside of campus speakers who wanted to use the plaza? It's not one of our arguments. So if that's true, why isn't it? Don't those restrictions show that it's not fully open to outside speakers? No, that's a fallacy. I think that Justice Kennedy's concurring opinion in Lee provides the perfect public forum analysis that incorporates, first of all, historical usage, physical characteristics. So this is in the middle of a campus. It's not like a, you know, park that's out in a public street. It's in the middle of a campus surrounded by buildings that are campus buildings. So how is that traditional public forum? It's surrounded by a bookstore, it's surrounded by a basketball gym, it's surrounded by an athletic facility, it's surrounded by the hospital. And why does that make it a traditional public forum? What's that? What about that? These urban features, these are the kind of features or characteristics you find in a downtown area or urban park. You find, and that is what, I can't remember the case, but that's what they say also. And the quad, when we talked a little bit, what's a quad? And it's surrounded by certain buildings that make it the quad. And we have a quad. Is every college campus that has a quad, which a lot of them do, surrounded by buildings? Is that, are they all public forums as a matter of law? Well, I think it's, you'd have to do a case-by-case analysis. If it's a 50 by 100 quad, I don't, I'm not sure that would fly. But in the apartheid Virginia case, the students for university students, Virginia students versus the administration over the right to set up shanties in a very pristine part of the campus to, you know, protesting apartheid in South Africa. And they had a shanty. I'm too big for this. But those were, those were students protesting, right? And there are a lot of cases, excuse me, about, you know, facilities like that being a forum for students. But I'm not aware of any case in which we've held that a, or any court has held that a square or a quad on a university campus is a traditional public forum with respect to third parties who are not affiliated with the university. Do you have any case? Well, there weren't, there weren't a lot of, there's not, there weren't a lot of law out there before this court found t-shirt, necessary t-shirts to be protected. There wasn't a lot of law out there before Mr. Most won the Anderson case on tattoos. I mean, this is how these things start. Can you point to a case that says that speakers other than students or other members of the university have a public forum in the university? Yes. What case? Well, the Bowman case out of the 10th circuit, which we cited in one of our briefs. And there are those cases, but why should that make a difference? We're not interfering. It makes a difference because Whitmer against Vincent says that it makes a difference, right? And if you look at it and they do allow outside groups, it's not that they don't see that's the, that's the problem. They'll give us a permit, but they're going to charge, charge us $500. Isn't that a limited public forum? They give limited access to outside speakers. Even in a limited public forum, the Seattle, the SeaTac case and the, and the bus cases, there were non-public forums in the, in this court, both still struck down those regulations. So non-public forum is not the kiss of death. Usually it is, but with all the, all the elements that we have present here, all the first amendment elements that we have in this case, even in a non-public forum, the $500 would be invalid. If a group cannot pay $500, say you're, which you are otherwise allowed to do. You can come on campus. They're not saying you can't come on. They're saying, if you want to come on, you have to pay $500 and you can only do it once a week. And Mr. Mr. Brown dove into that, invested $50,000 in his infrastructure to go out there. And now they're. Sorry, you used up almost all your time. If you want a minute for rebuttal, I think you should stop now. May it please the court. I'm Brian Sutherland for Appellee Michael Beck. The court should affirm for two reasons. First Christian lunch did not carry its burden to show that its conduct is expressive. And then it forfeited that point on appeal by not challenging the district court's ruling. And then second, the district court did not abuse discretion in determining that Christian Christian lunch did not have a likelihood of and the limit on the number of times that an outside group can make reservation for campus space that is prioritized for students. With respect to that first point, conduct is not presumptively expressive, especially here. The conduct at issue is food distribution. It's highly functional. And as the declaration of chance off hill shows, there is an exchange of money for the food that is happening in connection with these events like happened over the summer. I thought that they were giving the food out and some people made a donation. Some, whether you call it a donation or a payment, it doesn't make any difference because if you see that happening, it appears functional. And the declaration of Dennis Brown or Bovinda doesn't show what it is about that conduct that would have any communicative impact. If you look at his declaration in the record, it just says, here's what we do. It doesn't explain what is symbolic about that. And this case is a lot like in that regard, the edge versus city of Everett case where you have proposed conduct that is happening in close proximity to an exchange of money. That's what looks functional. Christian lunch didn't carry its burden on that point. But there's a lot of, I mean, it's not just the food. There's sort of ancillary, you know, they're telling people about, you know, the food has a particular significance and they have a message about why they're serving that kind of food and that they could talk to people as they're getting it. And at the motion to dismiss stage, we thought that was enough. So what's lacking now? Well, there's actually not a lot of evidence of that in this record. And we do need evidence on a preliminary injunction motion. And the district court said that the court said we're past the motion to dismiss stage. We're dealing with a preliminary injunction. When you say that, what do you mean expressive, expressive conduct or activity? Is that what you mean by, I think so. Your honor, if I just follow what you said, right. You said there wasn't a lot of evidence of that. And so I was just asking that really anything to show that the speaking was happening that would cause someone to have a great likelihood of understanding that the conduct was meant to be expressive. That's the that I was referring to. So I don't know. I mean, there are several declarations in the record of students who are describing, talking to them about consciousness, receiving literature. I'm not sure how you can say there isn't evidence of expressive conduct here. I mean, ER 191, ER 193, ER 197, 201, all of that is talking about this. I'll point out that those are all on reply. So we didn't have a chance to address those. But second reply in the district court. Is that why in the district court? Right. So we didn't have an opportunity to address them in the district court. That's my point. Did the district court exclude them? She didn't exclude them. What the court said in its prior opinion, I mean, even if you had been able to, I don't even know what you would have said. I mean, they say this happened. It's evidence that there's expressive conduct. Would you have said they're all lying? We would have addressed the point that those declarations just say I got literature. I enjoyed it. But that doesn't tell me anything about whether the food distribution has any meaning. Well, it definitely has to do with whether there's expressive conduct happening alongside it. Well, if conduct accompanied by speech becomes speech, then any conduct can be speech. And I don't think that's the rule. And I would cite the Fair v. Rumsfeld case for that proposition. All of this can be pretty moved, though, because they didn't raise any of these points in their opening brief. So there's a pretty clear forfeiture there. I mean, it's just not part of the case. They ignored what the district court said. The district court said, we are in a different posture here. The court previously said, these allegations are plausible, meaning they go to a fact finder. They did go to a fact finder. The fact finder was the district court on a preliminary injunction motion. And the fact finder said, at least for the purposes of preliminary injunction, I don't think this is expressive conduct. And you would have to find clear error or an abuse of discretion to turn that back and overlook the forfeiture. So our court in the prior appeal described the situation. Is there anything different about what the facts were at the preliminary injunction that didn't line up with what our court thought the facts were at the last stage? Correct, the chanting and the singing. And you've just heard admitted that that wasn't present. So that's between the plausible allegations that the court discussed. That's only that only matters if we think that you have to have chanting and singing. So let's assume for a moment we won't think that if you're distributing literature and talking that you also have to be chanting and singing. If we if we think that doesn't make a difference, what other facts are different? The facts? Well, we don't know. I mean, the plausibility standards pretty easy to me, I think, is the basis for the prior decision. But is there anything that there isn't? I mean, you say this thing about the reply, but assuming we take the declarations that weren't excluded, are there any facts that aren't supported in the assumptions our court made about the allegations? Any allegations that aren't supported other than the chanting? Dennis Brown's declaration doesn't really have any facts at all. So you're really just relying on the reply declarations. They support the idea that there was literature and talking. So I would agree with that much. If we assume expressive conduct, let's then go to the traditional public forum analysis, if I could. On that point, the district court also corrected and abused its discretion in concluding that this was not a traditional public forum under the three-factor test of ACL versus City of Las Vegas. The use is prioritized for students. Michael Zaluka's Still Recreation supports that point. Court was entitled to credit that point. Could you just clarify one thing for me? The $500, what is that charged for exactly? This is an important point, Your Honor. It's for renting space that the university owns. It's not a tax on activity. It's not for a license. It's not there because they're serving food? No. It's just because they're there? Correct. It's for renting space that the government owns. Do they only need it because they need a table to serve food? Or if they were just standing there with flyers, would they also need to rent the space? If they were just standing there with flyers, they would also need to rent the space. So there is that difference. But they're citing the case Murdoch. That's a case where the City of Jeannette in Pennsylvania said, you need to pay money to go door to door on property that the city did not own. So I think they're fundamentally confused about the difference between renting property that the government owns versus the government making people pay money to engage in some activity on property that the government does not own. And Your Honor indicated earlier, that is the entire difference between we're talking about a traditional public forum versus a non-public forum, or in other words, property that the government can rent and grant selective access to that property. So in terms of the traditional public forum analysis, we have a plaza here. It's not a sidewalk. It's not a lawn. Again, Michael DeLuca's declaration makes that clear. And historically, it's been used as a plaza. Again, Michael DeLuca's declaration makes that clear. The district court was entitled to credit it. It's not a designated forum either for the same reasons. As the declaration shows, UCLA has specifically taken this property out of the designated public forum category. Paragraphs 5 and 9 say that. Historically, it's always been a plaza that the university has reserved for students. The policy it has is logical. If an outside group like Krishna Lunch could come along and reserve the space for the entire semester, it wouldn't be there for students. And that's what makes this policy so reasonable. And if you look at page 183, that's Chan-Sothill's October 6, 2022 email to opposing counsel. And it says, you can't reserve it all at once. But on a trial basis, if you come back during the year and it happens to be free, then we'll consider, if it's available, additional reservation. So it was a very reasonable response to the unprecedented demand that he was making. Chan-Sothill says in her declaration, we've never had a group like this come and demand all the space. That's paragraph 8, I think, of her declaration. So they put the university in an unusual position in terms of all the space that's prioritized for student use. The university responds very reasonably in terms of the use limitation, which is one that all of the case law supports in terms of is the use and the limitation compatible with the purpose of the space? Cases like Widmar, Soders versus Lucero, other cases that say, of course, the purpose of the space. There's a UCLA policy at ER 122 that says, individuals, authorized student governments, and registered campus organizations may assemble and engage in discussion or non-amplified speech on university grounds generally open to the public. What does individuals refer to in that? I'm opening to that page. Sorry, can you tell me where you're at? 122 is what my notes say, and I'll pull it up myself. So I see the speech and advocacy policy on that page, your honor. I think it's in B1. So individuals, it's the second line of B1. Individuals, authorized student governments, and registered campus organizations. I'm wondering what individuals refers to. That's got to mean students. It can't mean outside groups. I would note, though, that the plaintiff here is not an individual. It's Krishna Lunch, which is an organization, so we can avoid that problem in that way. But as an interpretive matter, individuals has got to mean, well, if it's generally open to the public. That's what I was about to ask you. So why does it say that? I mean, why isn't that public individuals? We have, I guess we haven't briefed this in particular, but so addressing this for the first time, the Bruin Plaza is not generally open to the public. So when we're talking about- All right, so what grounds at UCLA are? The paved walkways and the lawns. And that is something that Michael Luca describes in his declaration and in the policy attached to his declaration. When we're talking about property that's generally open to the public, paved walkways, lawns, Bruin Plaza, not generally open to the public. And so- Wait, wait, I'm confused. So the parts of UCLA that are generally open to the public include the walk then? The Bruin walk? Is that what you mean? The walk that leads away from the plaza is open to the public, but the plaza is not? Is that what you're saying? Correct. That's right. So they could put their table, well, maybe they can't have a table, but they could stand along the walk? If they wanted to stand and talk, yes. If we're getting into food distribution, that's different. There we're talking about permits and concerns relating to congestion. And so Bruin walk is not at issue on this appeal so far as I know, but Bruin walk and Bruin Plaza are not similarly situated to your Honor's question, I think. They seem both equally open to the public from the perception of the public, I think, right? I mean, there's no way the public would know. We're allowed to be on the walk that leads to the plaza, but we can't be in the plaza. That's not obvious on the campus, I don't think, is it? Well, that's, let me say this. That's not at all what the district court found. The district court found that the plaza looks different to the public. And that's a finding I think you would review for theory. And the reason the district court said that is because the plaza is bounded. It looks different from a sidewalk. I don't think in ordinary common usage, you could mistake a plaza for a sidewalk because they have a different shape and they fit a different number of people. And so where does the policy tell the public that it's sidewalks but not plazas? It's in the same policy that you're looking at, Your Honor. Grounds open to the public, I'm on page 112. Grounds open to the public between the hours of 6 a.m. and midnight, paved pedestrian walkways and lawns on university property are generally open to the public. Excuse me. Have I answered Your Honor's question? Yes, thank you. Well, is there anything, is there anything in the record as to what has been done with other groups on the plaza? Yes, insofar as Chansop Hill's declaration states the policy and says this is the rental fee that we've historically charged over the last five years. That's pretty general. This is what our fee is, but this is the only organization that seems to, so far as we know, has actually been charged. I don't think that's, no, that's not. Well, that was my question. Are there any specifics in the record as to charging other organizations? Well, I think Chansop Hill's declaration says that, but I don't have a paragraph in mind. And then you've got Cindy Bolton's declaration that talks about the fees that vendors pay, which is a different space, but also demonstrates. That's for selling. Right, for space that they rent permanently. But yes, I think. But you said that this charge was made just for being there. Correct, correct. If there was any specifics of other groups. Because it's akin to a rental charge for the space that the university owns. Right. But my question was, is there anything in the record about other specific groups or individuals, non-students who have been charged for being there? Yes, I believe Chansop Hill's declaration says that, Your Honor. I think it doesn't name any other groups. But it doesn't specifically. Oh, specific. Specific. Identify other groups specifically. I don't believe, yeah, I believe that's right. I don't think it identifies other groups specifically. I think we also heard from my colleague, though, that he's not raising a challenge that we're treating other groups differently. I understand. I think we've taken you over your time. Thank you. Thank you. We have a little bit of time left. Well, we don't, but I was going to give a minute for rebuttal anyway. You may. I was going to give you a little extra. And first of all, it's important because first of all, donations are allowed on campus so long there's not a quid pro quo between the item and the money. But they said UCLA allows voluntary donations. When people cannot afford a plate of prasadam or they don't make a devotee, Mr. Brown, or Govinda, says he gives out 15 to 20 free plates every day. That's in the record. Our point is to communicate, not to make money or profit. And as to the record, I'm going to just read one. I know this is tacky, but Judge Bosman in the amalgamated Rockies case, which I think repairs the court's concerns on a preliminary injunction stage. And he said, inconsistent with the majority opinion, the whole question of the are often mostly guessing about important factual points that go, for example, to whether a statute has been violated. The arguments that flow from facts will not exactly have faith, do not have the clarity and development that will come later at further proceedings of the litigation. You can't get it all right and put every single thing there in the preliminary injunction. You're trying to get on campus, but we do have the four months under our belt. We have four months of non-eventful First Amendment activity. Whether it's all the things this court said or eight of the ten things the court said, that's protected speech in and of itself. I can't say I agreed with the previous panel that you had to have all these things. You don't. And I think we have enough of them indisputably enough of them to justify at this point a preliminary injunction so that we can go on and litigate the case. We've been doing this for six years. We have been excluded for six years. That's what equity jurisdiction of a preliminary injunction precisely means, to do equity to the party. First Amendment rights should not be given short shrift. Thank you. This case is submitted and we are adjourned for the week. All rise.
judges: SCHROEDER, FRIEDLAND, MILLER